GARY RESTAINO
United States Attorney
District of Arizona
SHEILA PHILLIPS
Michigan State Bar No.P51656
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: sheila.phillips2@usdoj.gov
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR-23-00818-PHX-DGC-1 |
| Plaintiff, | |
| vs. | **UNITED STATES' OBJECTONS TO THE PRESENTENCE REPORT** |
| 1. Nicolas Carrillo, | |
| Defendant. | |

The United States hereby objects to the guideline calculations in the Presentence Report (PSR). Defendant's conduct warrants a four-level enhancement for his knowledge and organization of the transport of firearms outside the United States under USSG §2K2.1(b)(6)(A).

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     FACTS SUPPORTING THE EXPORT ENHANCEMENT

On May 25, 2023, an indictment was filed in U.S. District Court, District of Arizona, charging Defendant with Count 1, Dealing Firearms without a License, in violation of 18 U.S.C. §§ 922(a)(1)(A), 923(a), and 924(a)(1)(D); and Counts 2 through 48: Material False Statement During the Purchase of a Firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). PSR ¶ 1. On February 22, 2024, Defendant pleaded guilty to Count 1 of the indictment admitting he engaged in the business of dealing firearms without a license.

(PSR ¶ 2.) Between January 13, 2021, and April 14, 2023, he bought and sold at least 78 firearms, 62 of which were semi-automatic rifles highly sought after by the members of the Mexican drug cartels. PSR ¶¶ 18 and 19. The number of firearms Defendant bought and sold could be substantially higher because it does not include any private purchases of firearms, which remained outside of the Bureau of Alcohol, Tobacco, Firearms and Explosive's (ATF's) ability to track. Moreover it does not include any firearms Defendant purchased after obtaining a permit to carry a concealed weapon (CCW) – which he obtained after being contacted by ATF regarding his illegal purchases and receiving a warning letter regarding selling firearms without a license, likely to avoid being detected. *See* (Exhibit 1 ¶ 19, Bates 566-567).

ATF's investigation of Defendant began after a Confidential Informant (CS-1), who was involved with a group trafficking firearms to Mexico, indicated that he had made straw for the group in Mexico in the greater Phoenix metropolitan area. CS-1 said the individuals in Mexico specifically instructed him to buy for certain persons in the Phoenix area and provide each the purchased firearm(s) to be transported into Mexico. According to CI-1, Defendant was one of the persons for whom he/she made a straw purchase. (Exhibit 1 ¶¶ 6-8, Bates 563).

ATF agents reviewed all known ATF Form 4473s to determine that Defendant purchased 78 firearms from Federal Firearms Licensees (FFLs). Multiple times, Defendant made purchases of the same rifles on the same date. Moreover, on some occasions, Defendant would purchase firearms from different FFLs on the same day. All these facts, indicate firearms trafficking to a criminal enterprise. Based upon these receipts and calculations, Defendant paid over $74,000 in cash for these firearms. *See* Exhibit 1 ¶¶ 29-48, Bates 569-574. Despite having very limited income, also evidencing he was purchasing the firearms for criminal organizations who often pay upfront, likely including a Mexican drug cartel. *Id.* Large cash payments are also indicative of purchases on behalf of criminal organizations. *Id.*

ATF agents seized Codefendant/girlfriend's phone when executing a search warrant on the couple's residence. Text messages on her phone confirmed that Defendant purchased high-powered, semi-automatic rifles for persons in Mexico, organizing firearms transport to Mexico, and likely crossed some of them into Mexico himself. Evidence of his crossing firearms himself include a text message from his girlfriend, which is supported by a correlation of his known firearm purchases with his border crossing history as explained in detail below. One text was about Defendant crossing a "girl", which is a likely reference to a firearm, from the border. In the text his girlfriend told her friend that he had done this before. *See* text dated May 17, 202, recorded below.

Another text to his girlfriend indicates Defendant's use of other persons to cross his firearms into Mexico. *See* April 13, 2022, text recorded below. Defendant texted his girlfriend about a person who could no longer cross his "drakes", which ATF agents believe was another cloaked reference to firearms. PSR ¶¶ 16 and 17. In other texts, his girlfriend repeatedly told Defendant to "be careful" or be "safe" when he met with "clients". *Id*. Her phone also contained pictures of Defendant and herself with firearms flaunting bundles of cash. PSR ¶ 15.

Some of the relevant text conversations, as follows [emphasis added]:

i. **May 17, 2021**: Text between Codefendant (girlfriend) and one of her friends.

**CODEFENDANT**- I get his work takes up a lot of his time and last time I didn't hear from him was when I was in Vegas and he went **to go cross that fucking girl from the border** so I'm thinking he's either on some shit like that and doesn't wanna tell me till he does it. **Like last time**. OR he has another bitch. And keeping me in the dark.

**Friend**- But Mariana. If he's doing that. Crossing thing. That has nothing to do with being honest about where y'all started. Like the correlation is not existent. One does not interfere with the other. (Exhibit 2, ROI 25, bates 530).

ii. **April 13, 2022:** Text about crossing "drakes".

**DEFENDANT**: Hows work babe

**CODEFENDANT**: Busy as hell

**DEFENDANT**: Me too. Stressing

**CODEFENDANT**: Why? Whats up?

**DEFENDANT**: **Money and the person who was going to cross my drakes can't anymore**.

**CODEFENDANT**: Oooo ok well that's something they need to figure out no? Instead of u stressing about it? Im home

**DEFENDANT**: I'm on the way to Mesa.

**DEFENDANT**: **Sent a picture of himself holding a stack of cash**.

(Exhibit 2, ROI 25, bates  534).

   iii. **May 18, 2022**: Text about money/profits involved.

**DEFENDANT**: you said, the gun store from Scottsdale called me

**CODEFENDANT**: dead ass lmao. And for what

**DEFENDANT**: They have a scar 17. For 3.5k. but that's a easy 6.5k.

**CODEFENDANT**: Sheeesh. You gonna get it?

**DEFENDANT**: I spent some money over the last days I gotta see if I got it. But sheshhhh that's a goooooooooooooooddd ticket. Remember it was 4.4k in another store.

**CODEFENDANT**: Yeah so its cheaper. You haven't got the 25k yet?

**DEFENDANT**: Dammmm foooo. Red flag. That's not sum to say over hereee. n stuff from the SW.

(Exhibit 2, ROI 25, bates 536)

   iv.   **June 27, 2022**:  Text about Defendant's cartel association

**CODEFENDANT**: Babe. My manager todsay told me that on Saturday they got a call in Laveen. Saying that a cartel with a white truck was gonna shoot the place up if she didn't give her a first aid kit cuss I guess they had a man dying in the truck. And then today we got the call at 24th st.

**DEFENDANT**: Tell her I said no cartel gas a green light to do that here

**CODEFENDANT**: She's all panicking and I don't know what to do lol so **I just wanted to let you know just in case.**

**DEFENDANT**: And if anything happens to let me know I'll make some call and handle it.

**CODEFENDANT**: Ok…

**DEFENDANT**: It's just ppl that try scamming and using the cartel scare tactics. That's all ca. Cap. **We don't do that bb.**

**CODEFENDANT**: Okay ill just chill.

(Exhibit 2, ROI 25, bates  539-540)

These texts in concert with the facts outlined above demonstrate that Defendant was: 1) Making a substantial profit on his sale of high-powered, semi-automatic rifles, which is only possible if he was selling them to a criminal organization. Persons who can buy the firearms legally and are not concerned with being identified by law enforcement, could buy each for thousands of dollars less from an FFL (*See*  Exhibit 1 ¶ 40, Bates 572); 2) Organizing the transport of firearms into Mexico; and 3) He was associated with a drug cartel.  Moreover, Defendant traveled to Mexico five times between March and July 2022, and he made multiple border crossings in 2021. PSR ¶ 6.

Defendant's border crossings coincide with several of his firearm purchases. On May 26, 2022, May 27, 2022, and June 1, 2022, Defendant purchased a total of five Century Arms AK-47 style, 7.62X39mm caliber rifles. (Exhibit 1 ¶ 28, Bates 569).  On June 2, 2022, Defendant also purchased a FN, Five-Seven, .57cal from Bear Arms Firearm and Accessories in Scottsdale, Arizona, which later recovered in Nogales, Mexico on September 8, 2022, resulting in a time to crime of 129 days. (Exhibit 1 ¶ 20, Bates 568). Data obtained from Defendant's cell phone from a historic tracking warrant showed that his phone traveled to Nogales, Arizona on June 3, 2022. (Exhibit 1 ¶ 28, Bates 569). Department of Homeland Security records show on June 7, 2022, Defendant crossed into the United States from Mexico. *Id*.  Later, on June 7, 2022, Defendant  again crossed into

the United States from Mexico via the pedestrian lane. *Id.*

## II. SENTENCING GUIDELINES

The Probation Officer calculates the Defendant's final offense level at 15. (PSR at 16.) Pursuant to United States Sentencing Guidelines (USSG) §2K2.1(b)(1)(B), this includes a four-level enhancement because the offense involved 80 firearms. (PSR ¶ 27). However, the PSR does not include an enhancement to knowing or reason to know firearms would be transported to Mexico, which is supported by the facts.

Pursuant to USSG §2K2.1(b)(6)(A), four more levels should be added because Defendant knew or had reason to believe that the firearms would be exported out of the United States. The government's calculations are as follows:

2K2.1 - Firearms

BOL: 12 2K2.1(a)(7)

6 2K2.1 (b)(1)(C) – at least 47 firearms but not more than 100 firearms

4 2k2.1(b)(6)(A) (knowledge firearms going to Mexico)

TOL: 22

With a Total Offense Level 22, Crim. Hist. Category I the applicable range would be 41-51 months before acceptance or 30-37 months after acceptance. The Plea Agreement, however, sets a 41-month cap on Defendant's term of incarceration and the Court can sentence Defendant up to this cap under the Plea Agreement. [1]

## III. FACTS CLEARLY WARRANT THE EXPORT ENHANCEMENT

Overwhelming facts exist to support the four-level export enhancement pursuant to USSG §2K2.1(b)(6)(A) to Defendant's offense level. The United States Sentencing Guidelines §2K2.1(b)(6)A) applies if the defendant [emphasis added]:

---

[1] The United States contemplated an additional 4-level enhancement for Firearms Trafficking Enhancement - USSG §2K2.1(b)(5) when making the plea offer. It is unclear, however, if knowing the firearms will be used in drug trafficking or firearms crimes in Mexico trigger the enhancement.

possessed any firearm or ammunition while leaving or attempting to leave the United States, **or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the States.**

The United States needs to prove by a preponderance of the evidence that the four-level export enhancement applies. *United States v. Prieto*, 85 F.4th 445, 449 (7th Cir. 2023); *United States v. Francis*, 891 F.3d 888, 896 (10th Cir. 2018); *United States v. Marceau*, 554 F.3d 24, 32 (1st Cir. 2009). It is not necessary for the United States to prove that the trafficked firearms crossed an international border. *Id. See also United States v. Fields*, 608 Fed Appx. 806, 813 (11th Cir. 2015) (noting that firearms trafficking enhancement applies if a defendant transfers a firearm to an undercover officer who tells defendant that he/she is a convicted felon). It is also not necessary to show that a defendant played a direct role in the exportation. *Id*. Rather, the focus of the sentencing court's inquiry should be on the defendant's state-of-mind when determining whether a defendant knew, intended, or had reason to believe that a firearm or ammunition would be exported out of the United States. *Id*.

Here, Defendant supplied one or more firearms to a group located in Mexico based on the CI-1's statements. Based on the text messages referenced above, Defendant knew he was purchasing firearms for persons in Mexico, organized the transportation of firearms to Mexico, and likely crossed more than one firearm into Mexico himself. The latter of which is supported by his border crossing history, some of which coincide with his firearm purchases.

The number of high-dollar firearms he purchased, and the type of firearms purchased also indicate knowledge that firearms would end up in Mexico and by a preponderance of the evidence, he crossed one or more firearms into Mexico. At least one of the firearms Defendant purchased, was in fact recovered in a crime in Mexico and its purchase corresponds to one of his border crossings As such, the Court should apply the four-level export enhancement.

## IV.    CONCLUSION

For the above reasons, the United States respectfully requests the Court apply both enhancements, which result in a final guideline range of 30-37 months imprisonment.

Respectfully submitted this 23rd day of May 2024.

GARY RESTAINO
United States Attorney
District of Arizona

*s/Sheila Phillips*
SHEILA PHILLIPS
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Kamille Rae Dean, Attorney for the Defendant.

*Carlton Covington*
U.S. Attorney's Office