AO 106 Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>A residence located at ▮▮▮ S. 73rd Dr., Laveen, AZ.<br>85339 and a yellow Dodge Charger, four-door<br>vehicle, bearing Texas license plate NHH5533 and<br>VIN number ending in x5828 | Case No. 23-5275MB<br><br>**(Filed Under Seal)** |

### AMENDED APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**As further described in Attachment A-1 & A-2**

located in the District of Arizona, there is now concealed:

**As set forth in Attachment B.**

The basis for the search under Fed. R. Crim. P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code/Section | Offense Description |
|---|---|
| 18 U.S.C § 922(a)(1)(A) | Engaging in the Business of Dealing Firearms Without a License |
| 18 USC § 924(a)(1)(A) | Providing False Information During a Firearms Transaction |
| 18 U.S.C. § 933 | Firearms Trafficking |

The application is based on these facts:

**See attached Affidavit of Special Agent Hannah Carroll**

☒ Continued on the attached sheet.
☐ Delayed notice of _30_ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA Sheila Phillips

*S.P.*

HANNAH CARROLL Digitally signed by HANNAH CARROLL
Date: 2023.04.28 14:56:10 -07'00'

_____
*Applicant's Signature*
HANNAH CARROLL
Special Agent Bureau of Alcohol, Tobacco, Firearms and
Explosives

Sworn to before me telephonically. Date: **5/1/2023**
**5:09pm**

City and state: Phoenix, Arizona

_____
*Printed name and title*

*Eswillett*

_____
*Judge's signature*
Honorable EILEEN S. WILLETT, U.S. Magistrate Judge
*Printed name and title*

555

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is ▮▮▮ S. 73rd Dr., Laveen, AZ. 85339 (the **Subject Premises**). The **Subject Premises** is a single-story home with an attached garage. The front door, windows, and the garage face west on S. 73rd Dr. The numbers "▮▮▮" are located on the front of **Subject Premises**. The house is tan in color, with a clay color roof and tan shutters. The **Subject Premises** includes any rooms and other parts therein, as well as the surrounding grounds, any storage rooms, and any trash containers located at the **Subject Premises**.



## ATTACHMENT A-2

### Property to Be Searched

The property to be searched is a yellow Dodge Charger, four-door vehicle, bearing Texas license plate NHH5533and VIN number ending in x5828 (the **Subject Vehicle**).

2

557

## ATTACHMENT B

*Property to be seized*

Agents are authorized to search for evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §922(a)(1)(A) (dealing firearms without a license), and 18 U.S.C. § 924(a)(1)(A) (providing false information during a firearms transaction), and 18 U.S.C. § 933 (trafficking in firearms), from April 6, 2018, through the date of issuance of this warrant, including:

1.  Firearms (including firearms parts, frames, receivers, and accessories), magazines, cases, boxes, holsters, slings, gun pieces, gun cleaning items or kits, ammunition belts, original box packaging, and records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms (including firearms parts, frames, receivers, and accessories).

2.  Ledgers, firearms customer lists, firearm inventory lists, descriptions and prices, dealer lists, criminal associates lists, or any notes containing the individual names of such persons, telephone numbers or addresses of these customers or dealers, and any records of accounts receivable, money paid or received, firearms supplied or received, cash received, or to be paid for firearms, or intended to be paid for firearms;

3.  Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, real and personal property, firearms (including firearms parts, frames, receivers, and accessories), or ammunition;

4.  Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, PayPal or other electronic money transfer services, check or money order purchase receipts, account statements, and any other records reflecting the receipt, deposit, or transfer of money;

5.  Safe deposit box keys, storage locker keys, safes, and related secure storage

558

devices, and documents relating to the rental or ownership of such units;

6.      Indicia of occupancy, residency, rental, ownership, or use of the Subject Premises and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

7.      Computers, cellular telephones, tablets, and other media storage devices, such as thumb drives, CD-ROMs, DVDs, Blu Ray disks, memory cards, and SIM cards (hereafter referred to collectively as "electronic storage media");

8.      Records evidencing ownership or use of electronic storage media, including sales receipts, registration records, and records of payment;

9.      Any records and information found within the digital contents of any electronic storage media seized from the Subject Premises, including:

    a.  all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of firearms (including firearms parts, frames, receivers, and accessories), and ammunition;

    b.  all information related to buyers or sources of firearms (including names, addresses, telephone numbers, locations, or any other identifying information);

    c.  all bank records, checks, credit card bills, account information, or other financial records;

    d.  all information regarding the receipt, transfer, possession, transportation, or use of firearm proceeds;

    e.  any information recording schedule or travel;

    f.  evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and

4

559

passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, correspondence, and phonebooks;

g.  evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

h.  evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

i.  evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

j.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

k.  passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

l.  documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

m. records of or information about Internet Protocol addresses used by the electronic storage media;

n.  records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

o.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies).  This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Hannah Carroll, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      Your Affiant makes this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises located at 7719 S. 73rd Drive, Laveen AZ 85339 (hereinafter the "**Subject Premises**"), as further described in Attachment A-1, and a yellow dodge charger bearing Texas license plate NHH5533 (hereinafter the "**Subject Vehicle**"), as further described in Attachment A-2, in order to search for and seize the items outlined in Attachment B, which represent evidence, fruits, and/or instrumentalities of the criminal violations further described below.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been since June 2018. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the ATF National Academy's Special Agent Basic Training. Prior to becoming a Special Agent, I was a sworn law enforcement officer with the Louisville Metro Police Department in Louisville, Kentucky, for eight years. I am currently assigned to the ATF Phoenix Field Office.

3.      During and prior to my tenure with ATF, I have been involved in investigations involving federal firearms and narcotics trafficking cases. I have reviewed investigative reports and had conversations with senior Special Agents who have advised of common firearms trafficking schemes and explained their methods of operations. I have become knowledgeable in the methods and modes used by firearms trafficking operations, as well as the language and patterns used. I am aware of techniques that are used to attempt to deter and hinder law enforcement investigations of firearms trafficking schemes, including the utilization of multiple cellular phones, planned distribution schemes, the use of false and/or fictitious identities, and the use of "straw" purchasers.

4.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on the facts set forth in this Affidavit, there is probable cause to believe that violations of 18 U.S.C. §922(a)(1)(A) (dealing firearms without a license), and 18 U.S.C. § 924(a)(1)(A) (providing false information during a firearms transaction), and 18 U.S.C. § 933 (trafficking in firearms) have been committed, are being committed, and will be committed by Nicolas CARRILLO. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

<u>**INVESTIGATION INTO NICOLAS CARRILLO**</u>

6.      Investigators have used a confidential source (CS-1) in this investigation. CS-1 has been working with law enforcement by providing information to work off charges in a federal investigation. CS-1 does not have a criminal history. Information provided by CS-1 has been established as reliable and corroborated through independent means and coordination with other federal agencies.

7.      In September of 2022, I received information from CS-1 that CARRILLO was involved in firearms trafficking. On multiple, separate occasions CS-1 was instructed by individuals in Mexico to purchase the firearms in the greater Phoenix metropolitan area and provide them to individuals to be trafficked into Mexico by individuals unknown to CS-1 . Further, CS-1 provided SA's telephone numbers of individuals whom he/she provided firearms to while engaging in straw purchasing and whom he/she obtained and received money from when he/she purchased a firearm.

8.      I queried the telephone numbers provided by CS-1 and found that two telephone numbers were associated with CARRILLO, ▮▮▮▮▮▮ and ▮▮▮▮▮▮ I showed CS-1 a series of photographs and he/she identified CARRILLO as one of the

2

individuals he/she provided firearms to and received money from. Additionally, CS-1 identified a vehicle CARRILLO had driven when he/she met CARRILLO for these exchanges as a yellow Dodge Charger. CS-1 further advised that on one occasion CARRILLO provided CS-1 with money to purchase firearms.

9. After learning of this information, I queried ATF databases and found in July of 2022, ATF Crime Gun Intelligence Center (CGIC), initiated a case into Nicolas CARRILLO regarding him being suspected of firearms trafficking. At the time of the case initiation, ATF was aware that CARRILLO had purchased approximately 48 firearms in excess of $40,000 between the dates of April 8, 2022, and July 25, 2022. At the time, CGIC  conducted a query of CARRILLO's reported wages and learned he had zero reported wages in the State of Arizona during 2022.

10. ATF Special Agent (SA) Atencio was assigned the aforementioned CGIC Trafficking Referral pertaining to CARRILLO. On August 3, 2022, SA Atencio and SA Sander contacted CARRILLO at **Subject Premises** to conduct an interview regarding his firearm purchasing. **Subject Premises** is the address CARRILLO previously used and has continues to use when completing the ATF Form 4473.  CARRILLO last listed this address when completing the ATF Form 4473 on April 14, 2023.

11. Upon contacting CARRILLO in regard to the CGIC Trafficking Referral, SAs Atencio and Sander identified themselves with their ATF credentials. Immediately CARRILLO asked if they had a warrant. SA Atencio explained to CARRILLO they just wanted to talk to him about the forty-eight (48) firearms he had purchased.

12. CARRILLO advised that he was previously a member of the Armed Forces for the  US Army and had recently "got out." When asked if he still was in possession of all the 48 firearms he was known to have purchased, CARRILLO said "yes".  When asked if he'd sold any, CARRILLO indicated some of them were at his brother's house and the remainder were at the current location (**Subject Premises**). SA Atencio asked CARRILLO if they could see the guns he had in his possession, and CARRILLO again asked if SA Atencio had a search warrant. SA Atencio said "no", but SAs wanted to verify CARRILLO

3

564

still maintained all the guns he'd previously purchased. SA Atencio further explained to CARRILLO that ATF wanted to make sure he was not dealing firearms without a license and ATF did not care how many guns were in a person's possession. CARRILLO again said, he still had all of his guns, only some were with his brother (unidentified) and some were with him at that current location.

13.    CARRILLO said he did not feel comfortable allowing the SAs into his home without a warrant.  At this time, SA Atencio presented CARRILLO with a Warning Letter for Dealing Firearms Without a License. CARRILLO refused to sign the document but was given a copy for his own records.  The contact between agents and CARRILLO was terminated at this time.  SA Atencio closed the case until further information was gathered.

## CARRILLOS FIREARM PURCHASES

14.    After learning of the information from CS-1, I began analyzing all known ATF Form 4473s for firearms purchased by CARRILLO. These forms show that CARRILLO had purchased 69 known firearms from Arizona FFLs from March 5, 2022-August 2, 2022, in a 6-month period.

15.    Firearm purchases of the same make and model were also noted.  Most of the firearms were Century Arms AK-47 style rifles with most of the rifles being of 7.62X39mm caliber. On multiple dates, CARRILLO made purchases of the same rifles on the same date. Moreover, on some occasions, CARRILLO would purchase firearms from different FFLs on the same day. For example, on June 1, 2022, CARRILLO purchased two Century Arms VSKA rifles, 7.62X39mm caliber, from Tactical Studio. On the same day, he also purchased a James River Armory, Sporter rifle, 7.62X39mm caliber from Tombstone Tactical. On July 12, 2022, CARRILLO purchased a Century Arms, WASR-10 Milstik from Tactical Studio. On the same day, CARRILLO purchased an FN 17S from Ammo AZ.  Included in CARRILLO's purchases were approximately eight (8) various handguns.

16.    On April 20, 2023, I learned that CARRILLO purchased a firearm on April 14, 2023, from Lone Wolf Trading Co located at 5140 W. Peoria Ave #110, Glendale AZ 85301.  The firearm was a Century Arms Inc, pistol, 7.62 caliber, serial #BFT47P02276,

4

similar to the other firearms he has purchased. I learned CARRILLO purchased six additional firearms in 2023 and they are all Century Arms, 7.62X39mm caliber and pistol or rifle type variation. CARRILLO has continued to purchase the same type of firearms after he was served a warning letter by ATF for dealing in firearms without a license. The address CARRILLO listed as list residential address on the ATF Form 4473 for all these purchases was the **Subject Premises**. CARRILLO does not have a federal firearms license to deal in firearms through ATF.

17.    After learning of the additional firearms purchased in 2023, ATF is aware that CARRILLO has 77 known firearm purchases. I reviewed the available purchase amounts of CARRILLOs firearms purchases. Some of the FFL's kept an accurate amount of money spent on firearms. However, Tactical Studio only listed the amount a particular firearm cost the customers on the 4473 (fees and taxes are not included). Tactical Studio does not maintain purchase receipts. Bear Arms had receipts most of the firearms and indicated the missing receipt was approximately the same price as the other similar firearms purchased by CARRILLO. Based upon these receipts and calculations, CARRILLO paid approximately $74,000 for these firearms.

18.    I requested all police reports and calls for service from Phoenix Police Department in reference to CARRILLO and **Subject Premises.** On May 1, 2022, CARRILLO reported that his vehicle was vandalized outside of a night club and a Glock firearm was stolen from his vehicle.  CARRILLO nor any other individuals at **Subject Premises** have reported any firearms stolen.

19.    CARRILLO is not prohibited from possessing firearms and can legally purchase firearms from an FFL. When a person buys a firearm from an FFL, the FFL contacts the National Instant Criminal Background Check system (NICS) electronically or by phone. The prospective buyer fills out the 4473, and the FFL relays that information to NICS. The NICS staff performs a background check on the buyer. That background check verifies the buyer does not have a criminal record or isn't otherwise ineligible to purchase or own a firearm. During a criminal investigation, ATF can place an alert on an individual

5

566

and if a NICS background check is performed, ATF will be notified. However, if the individual has a concealed carry permit, it allows a purchaser to purchase a firearm without the FFL having to conduct a background check. On June 29, 2022, CARRILLO obtained an Arizona carrying concealed weapons permit (CCW). I know based on my training and experience, it is common for firearms traffickers to obtain a CCW to avoid detection by law enforcement.

**CARRILLO's FIREARM RECOVERIES**

20.     When a police department or Federal agency recovers a firearm, they commonly initiate a trace request though ATF to determine the original purchaser of the firearm. The trace also provides information about the length of time between the original purchase of the firearm and the time that the firearm was recovered or seized due to a crime, known as the time to crime (TTC). On June 2, 2022, CARRILLO purchased a FN, Five-Seven, .57cal, serial # 386424434 from Bear Arms Firearm and Accessories located at 10321 N. Scottsdale Rd, Scottsdale AZ 85253. This firearm was recovered in Nogales, Mexico on September 8, 2022, resulting in a time to crime of 129 days from when CARRILLO originally purchased it on June 2, 2022.

21.     On April 21, 2023, I learned that CARRILLO purchased a firearm that was recovered in Phoenix, Arizona. On June 18, 2022, CARRILLO purchased a Glock, 20gen4, 10mm, serial #BWZZ334 from Randall's Sporting Goods located 5023 W. Olive Ave, Glendale AZ 85302. The firearm was recovered in Phoenix, Arizona on March 12, 2023, resulting in a time to crime of 267 days from when CARRILLO originally purchased it on June 18, 2022, It should be noted, the firearm was recovered from a vehicle where the individuals were involved in a shooting, and one individual had been shot. I know based on my training and experience, firearm recoveries with a short TTC are indicators of firearms trafficking.

6

**CELLULAR TELEPHONE LOCATION DATA**

22.     On October 25, 2022, I obtained a search warrant for call records and historical data from CARRILLO's two known telephone numbers, ███████████ and ██ ███████. T-Mobile, the service provider for telephone number ███████████, provided records showing that CARRILLO was listed as the subscriber for this account. CARRILLO was in contact with the CS-1 during the times the CS-1 identified of the money and firearm transfers to CARRILLO. I corroborated this information by matching the calls and dates with the firearm purchases made by CS-1. I found this information provided by CS-1 to be reliable.

23.     The T-Mobile return advised the subscriber status for telephone number ██ ███████ was cancelled. The account expired on August 3, 2022. The disconnect reason was listed as: customer request. The account was disconnected the same day ATF SA's contacted CARRILLO at **Subject Premises**.

24.     CARRILLOS telephone had almost daily hits off multiple towers near **Subject Premises.**

25.     During analyzation of CARRILLO's call records, it was found that the telephone had multiple calls to various FFLs throughout Arizona. I know that CARRILLO's telephone contacted at least 17 different FFLs on various occasions. I also know through training and experience that purchasers will often contact various FFL's if they are looking for a particular type of firearm. As previously mentioned, CARRILLO purchased a large quantity of Ak-47 style rifles.

26.     ATF personnel assisting with this investigation, assisted in mapping CARRILLOS location with the data provided by T-Mobile on various dates of his firearm purchases. The data determined that CARRILLO spends the majority of his time in Phoenix, AZ and has travelled to Flagstaff, Tucson, Nogales, AZ and El Paso, TX. Of note, the data shows that CARRILLO'S cell phone regularly communicates with towers near his residence, various FFL's, and undetermined locations in Arizona to include Avondale, Litchfield Park, and Glendale area during the date of his firearm purchases

7

568

27.     I know, through information provided by Homeland Security Investigations Special Agent Cook, that CARRILLO has a history of recorded crossings between the United States and Mexico. Department of Homeland Security (DHS) records show CARRILLO has been encountered crossing from Mexico into the United States on approximately twelve occasions. CARRILLO has been encountered crossing from Mexico into the United States on five occasions in 2022. The first recorded crossing from Mexico into the United States is on February 17, 2014. The most recent recorded crossing from Mexico into the United States is on March 6, 2023.

28.     On May 26, 2022, May 27, 2022, and June 1, 2022, CARRILLO purchased a total of five Century Arms AK-47 style, 7.62X39mm caliber rifles. The data obtained from his cell phone showed that the phone traveled to Nogales, Arizona on June 3, 2022. DHS records show on June 7, 2022, CARRILLO crossed into the United States from Mexico at approximately 1330 hours (EST). Later, on June 7, 2022, CARRILLO again crossed into the United States from Mexico via the pedestrian lane at approximately 1758 hours (EST).

### FINANCIAL INVESTIGATION OF CARRILLO

29.     ATF CGIC queried the Arizona Department of Economic Security for CARRILLO'S employment and wage earnings. In 2021, CARRILLO had a reportable income from Desert Mountain Company Phoenix for $10.803.11. An updated income from 2022 reflected that CARRILLOS has a reportable income from various employers in the state of Arizona for $7,058.24.

30.     CARRILLO has spent approximately $74,000 in firearms since March 2022 with most of these purchases occurring within six months.

31.     SA's conducted an analysis of CARRILLO's bank account, Navy Federal Credit Union, and found that on January 1, 2022, there was a negative balance. On March 28, 2022, a charge off totaling $470.05 was applied to the account, and the account was closed. CARRILLO's savings account maintained a balance of $5 or less from January 1, 2022, through January 13, 2023, with little to no activity. On or around September 13,

8

2019, CARRILLO also received a $4,500 loan for a vehicle. As of September 13, 2022, CARRILLO owed more than $1,145 in past due loan payments. After that statement period Navy Federal Credit Union charged off the auto loan.

32.     A review of CARRILLO's Green Dot account was also conducted and found that he transferred money to a Mariana MAGDALENO (TORRES). SAs reviewed the Bank of America account for TORRES and found that around September 2022, (after he was aware of ATF's investigation) CARRILLO began getting direct deposits from various employers placed into TORRES account. The amount being deposited appears to be his direct deposit from CARRILLO's employers being sent to TORRES account. The most recent deposits were around $500 a week.

33.     It appears, CARRILLO began using TORRES bank account shortly after he was contacted by ATF, thus making CARRILLOs financial activity more difficult to identify.

34.     On March 7, 2022, TORRES purchased a FN, Scar17, rifle, .308, serial #H1C12883 with cash for $4,321.95.

**ADDITIONAL INFORMATION REGARDING CARRILLO**
**INDICATORS OF FIREARM TRAFFICKING**

35.     When a person purchases a firearm from a federal firearms licensee (FFL), that person must fill out an ATF Form 4473. This form is the official transfer record that documents the transfer of the purchased firearm(s) from the FFL to the purchaser. When a purchaser fills out the form, the purchaser must provide personal information and answer a series of questions that are designed to determine if the purchaser is buying the firearms for himself and if the purchaser is a prohibited possessor. The dealer fills out portions of the form as well, to include the make, model, and serial number of the firearm(s) being transferred. If a purchaser buys two or more pistols in five days, the FFL must send a notice of a multiple sale to ATF. On this notice, the FFL must provide ATF with the name, date

9

of birth, address, other personal identifiers of the purchaser, and the firearms purchased by the buyer. As an ATF agent, I have access to a database where multiple sale information is stored.

36.    Section B of ATF Form 4473 asks for the purchaser's name, date of birth, current address, and other personal identifiers. The purchaser must also answer a series of questions designed to determine if that person is a prohibited possessor. Section B also contains a certification that states, "I certify that my answers are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 21.a. (previously 11.a.) if I am not the actual transferee/buyer is a crime punishable as a felony under Federal Law, and may also violate State and/or local law.." It further states that "I also understand that making any false oral or written statements, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal Law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a federal firearms license is a violation of Federal law.…" Below this paragraph, the purchaser must sign and date.

37.    I reviewed each ATF Form 4473 completed by CARRILLO for these purchases. CARRILLO answered "yes" to question 21a., certifying that he is the true purchaser of each firearm.

38.    Firearms diversion is the movement of a firearm(s) out of lawful commerce and into the illegal marketplace through an illegal method or for an illegal purpose. Firearms trafficking is unlawful firearms diversion done for the purpose of profit, power, or prestige in furtherance of other criminal acts.

39.    Purchasing a large quantity of a firearms that are of the same make and model is an indicator of firearms trafficking. CARRILLO purchased 77 known firearms from five FFLs throughout Maricopa County. Most of the firearm purchases were in a six-month period. Almost all these firearms are the same make and model (AK-47 style rifles of 7.62X39mm caliber). CARRILLO also purchased three known FN, SCAR, rifles. These

10

571

rifles can cost an estimated $4,000 per firearm and possibly more. I know that AK-47s type rifles and the FN Scar rifles are a few of the most highly sought-after firearms "ordered" by individuals involved in illegal activity in Mexico. Most of the transactions were completed in cash transactions.

40.     Furthermore, people with minimal income purchasing a large quantity of firearms is another indicator of firearms trafficking for profit. CARRILLO had approximately $18,000 dollars in reported income in Arizona from 2021-2022. Also, during this time frame, CARRILLO defaulted on his auto loan while spending approximately $74,000 on firearms in cash payments. I know through my training and experience that firearms purchased can be sold for two to three times the price to someone involved in the criminal element. For example, a firearm purchased for $500 in Arizona can be sold for $1000–$2000 in Mexico in the illegal trade.

41.     I know through my training and experience that CARRILLO's minimal income, large quantity of firearm purchases, firearm recoveries, and purchase of many similar types of firearms are also indicative of "orders" being fulfilled.

42.     Multiple purchases of the same firearm followed by a firearm recovery with a short time to crime can indicate that the original purchaser did not, in fact, purchase the firearms for him- or herself. Firearm recoveries like these are an indicator that the purchaser potentially sold the recovered firearm to someone involved in the criminal element. The time to crime of CARRILLOS's recovered firearm are 129 days and 267 days.

43.     Furthermore, carrying a concealed weapon in Arizona is legal without a permit. It is common that people involved in the illegal sales of firearms will obtain a CCW for the sole purpose of avoiding detection from law enforcement. On June 29, 2022, during the height of his firearm purchasing, CARRILLO obtained a CCW.

44.     ATF knows of CARRILLO purchasing one firearm on January 2, 2021. In 2022, ATF now knows of CARRILLO's firearm purchases beginning on March 5, 2022. During this time, CARRILLO purchased firearms on three different dates in March 2022. After March 2022, CARRILLOS firearm purchases began to drastically increase.

11

572

45.    On August 2, 2022, CARRILLO purchased five firearms from Tactical Studio. They were all Century Arms, VSKA model, 7.62X39mm caliber. On August 3, 2022, SA Atencio and Sander contacted CARRILLO about his suspicious firearm purchases. ATF was not aware of anymore firearm purchases made by CARRILLO after that date until January 2023, when CARRILLO began to purchase more of the same type of firearms again SA's were unaware of these purchases due to CARRILLO obtaining a CCW, which enables him to bypass the background and thus, ATF is not alerted.

46.    Based on my training and experience and consultation with other experienced firearms trafficking investigators, numerous past and current ATF investigations have shown that straw purchasers are routinely recruited to purchase firearms in the State of Arizona to be smuggled into the country of Mexico. I know that Mexico has very strict firearms laws. I know that in Mexico most firearms are extremely regulated and hard to acquire legally, and there is a firearms registry for those that are. Arizona has none of these restrictions and therefore acquiring firearms in Arizona is much easier for those who intend to use firearms for unlawful purposes.

47.    Furthermore, I know, through training provided by the Department of Justice, my experience in working firearm trafficking cases, and information provided by other special agents and conversations had with individuals involved in the criminal element of firearms trafficking, of how these trafficking organizations operate and their hierarchy. I know that the straw purchasers are commonly in contact with an individual who requested the firearms to be purchased. Once the straw purchaser purchases the requested firearms the firearms are often transferred to another individual, commonly referred to as a "broker." The "broker" will commonly provide the firearms to a "stash house" or another individual. These firearms will then be prepared to be transported into the country of Mexico by a "driver/courier". Once the firearms are transported by the "driver/courier" into the country of Mexico, a "Mexico firearms broker" will coordinate the dispersal of firearms to the requesting parties which are typically directly and indirectly involved with Transnational Criminal Organizations and/or Cartels.

12

573

48.    Through all information currently known in this investigation, I believe CARRILLO to be acting as a straw-purchaser and a "broker" for illegal firearms transactions on behalf of Transnational Criminal Organizations and/or Cartels in the country of Mexico and purchasing and orchestrating the firearms diversion in Arizona.

### CARRILLO TIES TO SUBJECT PREMISES AND SUBJECT VEHICLE

49.    On August 3, 2022, CARRILLO was interviewed by ATF SA's at **Subject Premises**.

50.    CARRILLO has listed **Subject Premises** on all known ATF Form 4473s as his residence recent as April 14, 2023.

51.    On January 7, 2022, a driver's license was issued to CARRILLO and the residence address was listed as **Subject Premises**. On March 16, 2023, a new driver's license was issued for CARRILLO and the residence address was listed as **Subject Premises**

52.    In October of 2022, I obtained a search warrant for historical cell site data on the telephone number associated with CARRILLO. The data returned showed it was the cell phone was in close proximity to cellular towers near **Subject Premises.**

53.    Through surveillance, CARRILLO has been observed operating **Subject Vehicle** and it has been observed at **Subject Premises**. The vehicle is registered to Elizabeth Carrillo. Elizabeth Carrillo's address is listed as **Subject Premises.**

54.    Furthermore, when CS-1 met with CARRILLO for firearms transactions, he/she identified CARRILLO as driving a yellow dodge charger.

55.    On April 27, 2023, SA Carroll observed CARRILLO in the garage of **Subject Premises** working on **Subject Vehicle.**

### ITEMS TO BE SEIZED

56.    Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found at the **Subject Premises** and in the **Subject Vehicle**.

13

57.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, your Affiant knows the following:

a.    Firearm traffickers often maintain paper records of their firearm trafficking activities. Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the **Subject Premises** and in the **Subject Vehicle**. Furthermore, it is common for firearms traffickers to maintain purchase receipts, gun boxes, ledgers and other items that indicate firearms trafficking in their residence or vehicles.

b.    Firearms traffickers commonly use computers, cellular telephones, and other electronic devices to communicate with other drug traffickers and customers about drug-related activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, firearm traffickers commonly use other capabilities of computers and electronic devices to further their firearm trafficking activities. Therefore, evidence related to firearm trafficking activity is likely to be found on electronic storage media found at the **Subject Premises** and in the **Subject Vehicle**, as further described below.

58.    In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the **Subject Premises** and the **Subject Vehicle**, including rent receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## I.    DIGITAL EVIDENCE STORED WITHIN ELECTRONIC STORAGE MEDIA

59.    As described in Attachment B, this application seeks permission to search for records that might be found in or on the **Subject Premises** and the **Subject Vehicle**, in whatever form they are found, including data stored on a computer, cellular telephone, tablet, or other media storage device, such as a thumb drive, Blu Ray disk, memory card,

14

575

or SIM card (hereafter collectively referred to as "electronic storage media"). Thus, the warrant applied for would authorize the seizure of all electronic storage media found in or on the **Subject Premises** and the **Subject Vehicle** and, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

60.    *Probable cause.* Your Affiant submits that if electronic storage media are found in or on the **Subject Premises** and the **Subject Vehicle**, there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on such media, for at least the following reasons:

a.    Your Affiant knows that when an individual uses certain electronic storage media, the electronic storage media may serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic storage media is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic storage media is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that electronic storage media used to commit a crime of this type may contain: data that is evidence of how the electronic storage media was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b.    Based on my knowledge, training, and experience, your Affiant knows that electronic storage media contain electronically stored data, including, but not limited to, records related to communications made to or from the electronic storage media, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

15

576

c.      Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic storage medium, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

d.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the electronic storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

e.      As previously set forth in this Affidavit, the targets of this investigation have used electronic storage media to make telephone calls at times and dates surrounding their firearms purchases. They have also used electronic storage media to send photographs of firearms that they purchased to another individual. By training and experience, your Affiant also knows that all types of electronic communication are commonly used to further firearms trafficking. Cellular telephones are the primary source of communication for firearms traffickers, computers are used to communicate through email and messaging, while USB drives, CD-ROMs, DVDs, Blu Ray disks, memory cards, or SIM cards are regularly used to store data removed from the computer or other electronic device. Therefore, your Affiant believes that evidence of criminal activity, specifically including information regarding straw purchasing by the subject, information regarding straw purchasing by others on behalf of the subject, and potential current locations of firearms that have traveled out of legal commerce into illegal commerce, will be found on any electronic storage media found at the **Subject Premises** and the **Subject Vehicle** and that the electronic storage media constitute instrumentalities of the criminal activity.

16

577

61.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the electronic storage media were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be found on any electronic storage media located in or on the **Subject Premises** and the **Subject Vehicle** because:

a.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. File systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the storage medium. This

17

"user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the owner. Further, activity on an electronic storage medium can indicate how and when the storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on an electronic storage medium may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the existence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera) not previously identified. The geographic and timeline information described herein may either inculpate or exculpate the user of the electronic storage medium. Last, information stored within an electronic storage medium may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on an electronic storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, electronic storage medium evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one electronic storage medium is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how an electronic storage medium was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

62.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on electronic storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

19

a.    *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine electronic storage media to obtain evidence. Electronic storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    *Technical requirements*. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the electronic storage media off-site and reviewing it in a controlled environment allows for a thorough examination with the proper tools and knowledge.

c.    *Variety of forms of electronic media*. Records sought under this warrant could be stored in a variety of electronic storage media formats that may require off-site reviewing with specialized forensic tools.

63.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit seizing, imaging, or otherwise copying electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might

20

expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

64.     Because another individual may share the **Subject Premises** as a residence, it is possible that the **Subject Premises** will contain electronic storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those electronic storage media, the warrant applied for would permit the seizure and review of those items as well.

## II.    CONCLUSION

65.     Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and/or instrumentalities of violations of 18 U.S.C. §922(a)(1)(A) (dealing firearms without a license), and 18 U.S.C. § 924(a)(1)(A) (providing false information during a firearms transaction), and 18 U.S.C. § 933 (trafficking in firearms) and by CARRILLO, and other known and unknown co-conspirators, are likely to be found at the **Subject Premises**, which is further described in Attachment A-1, and in the **Subject Vehicle**, which is further described in Attachment A-2.

Respectfully submitted,

HANNAH CARROLL
Digitally signed by HANNAH CARROLL
Date: 2023.04.28 12:18:36 -07'00'

Hannah Carroll, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to before me on_____May 1, 2023_____, 20___

EsWillett

HON. EILEEN S. WILLETT
UNITED STATES MAGISTRATE JUDGE

21

AO93 Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Arizona

| | |
|---|---|
| In the Matter of the Search of<br>A residence located at 7719 S. 73rd Dr., Laveen, AZ.<br>85339 and a yellow Dodge Charger, four-door<br>vehicle, bearing Texas license plate NHH5533 and<br>VIN number ending in x5828 | Case No. 23-5275MB<br><br>**(Filed Under Seal)** |

## AMENDED SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of Arizona:

### As further described in Attachment A-1 & A-2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal:

### As set forth in Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before __5/15/2023__ *(not to exceed 14 days)*
☒ in the daytime 6:00 a.m. to 10:00 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any United States Magistrate Judge on criminal duty in the District of Arizona.

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized ☐ for _30_ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    __5/1/2023@5:09pm__          *EsWillett*
                                                        *Judge's signature*

City and state: Phoenix, Arizona                  Honorable EILEEN S. WILLETT, U.S. Magistrate Judge
                                                        *Printed name and title*

583

AO 93 (Rev. 01/09) Search and Seizure Warrant (Page 2)

## RETURN

| Case No.: | Date and Time Warrant Executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory Made in the Presence of:

Inventory of the property taken and name of any person(s) seized:

## CERTIFICATION

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:_____

_____
*Executing officer's signature*

_____
*Printed name and title*

584

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is 7719 S. 73rd Dr., Laveen, AZ. 85339 (the **Subject Premises**). The **Subject Premises** is a single-story home with an attached garage. The front door, windows, and the garage face west on S. 73rd Dr. The numbers "7719" are located on the front of **Subject Premises**. The house is tan in color, with a clay color roof and tan shutters. The **Subject Premises** includes any rooms and other parts therein, as well as the surrounding grounds, any storage rooms, and any trash containers located at the **Subject Premises**.



## ATTACHMENT A-2

### Property to Be Searched

The property to be searched is a yellow Dodge Charger, four-door vehicle, bearing Texas license plate NHH5533and VIN number ending in x5828 (the **Subject Vehicle**).

2

586

## ATTACHMENT B

### *Property to be seized*

Agents are authorized to search for evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §922(a)(1)(A) (dealing firearms without a license), and 18 U.S.C. § 924(a)(1)(A) (providing false information during a firearms transaction), and 18 U.S.C. § 933 (trafficking in firearms), from April 6, 2018, through the date of issuance of this warrant, including:

1. Firearms (including firearms parts, frames, receivers, and accessories), magazines, cases, boxes, holsters, slings, gun pieces, gun cleaning items or kits, ammunition belts, original box packaging, and records, receipts, or other paperwork showing the purchase, storage, disposition, or dominion and control over firearms (including firearms parts, frames, receivers, and accessories).

2. Ledgers, firearms customer lists, firearm inventory lists, descriptions and prices, dealer lists, criminal associates lists, or any notes containing the individual names of such persons, telephone numbers or addresses of these customers or dealers, and any records of accounts receivable, money paid or received, firearms supplied or received, cash received, or to be paid for firearms, or intended to be paid for firearms;

3. Photographs, including still photos, negatives, slides, videotapes, and films, in particular those showing co-conspirators, criminal associates, U.S. currency, real and personal property, firearms (including firearms parts, frames, receivers, and accessories), or ammunition;

4. Records relating to the receipt, transportation, deposit, transfer, or distribution of money, including but not limited to, direct deposit confirmations, wire transfers, money orders, cashier's checks, check stubs, PayPal or other electronic money transfer services, check or money order purchase receipts, account statements, and any other records reflecting the receipt, deposit, or transfer of money;

5. Safe deposit box keys, storage locker keys, safes, and related secure storage

3

587

devices, and documents relating to the rental or ownership of such units;

6.    Indicia of occupancy, residency, rental, ownership, or use of the Subject Premises and any vehicles found thereon during the execution of the warrant, including, utility and telephone bills, canceled envelopes, rental, purchase or lease agreements, identification documents, keys, records of real estate transactions, vehicle titles and registration, and vehicle maintenance records;

7.    Computers, cellular telephones, tablets, and other media storage devices, such as thumb drives, CD-ROMs, DVDs, Blu Ray disks, memory cards, and SIM cards (hereafter referred to collectively as "electronic storage media");

8.    Records evidencing ownership or use of electronic storage media, including sales receipts, registration records, and records of payment;

9.    Any records and information found within the digital contents of any electronic storage media seized from the Subject Premises, including:

   a. all information related to the sale, purchase, receipt, shipping, importation, transportation, transfer, possession, or use of firearms (including firearms parts, frames, receivers, and accessories), and ammunition;

   b. all information related to buyers or sources of firearms (including names, addresses, telephone numbers, locations, or any other identifying information);

   c. all bank records, checks, credit card bills, account information, or other financial records;

   d. all information regarding the receipt, transfer, possession, transportation, or use of firearm proceeds;

   e. any information recording schedule or travel;

   f. evidence of who used, owned, or controlled the electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and

4

passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, correspondence, and phonebooks;

g. evidence indicating how and when the electronic storage media were accessed or used to determine the chronological context of electronic storage media access, use, and events relating to crime under investigation and to the electronic storage media user;

h. evidence indicating the electronic storage media user's state of mind as it relates to the crime under investigation;

i. evidence of the attachment to an electronic storage medium of another storage device or similar container for electronic evidence;

j. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic storage media;

k. passwords, encryption keys, and other access devices that may be necessary to access the electronic storage media;

l. documentation and manuals that may be necessary to access the electronic storage media or to conduct a forensic examination of the electronic storage media;

m. records of or information about Internet Protocol addresses used by the electronic storage media;

n. records of or information about the electronic storage media's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

o. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as prints, slides, negatives, videotapes, motion pictures, or photocopies).  This shall include records of telephone calls; names, telephone numbers, usernames, or other identifiers saved in address books, contacts lists and other directories; text messages and other stored communications; subscriber and device information; voicemails or other audio recordings; videos; photographs; e-mails; internet browsing history; calendars; to-do lists; contact information; mapping and GPS information; data from "apps," including stored communications; reminders, alerts and notes; and any other information in the stored memory or accessed by the electronic features of the computer, electronic device, or other storage medium.

590